# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs January 25, 2011

## STATE OF TENNESSEE v. WILLIAM T. MINTON

**Direct Appeal from the Circuit Court for Rhea County**
**No. 17079    Thomas W. Graham, Judge**

---

**No. E2010-01156-CCA-R3-CD - Filed September 1, 2011**

---

A Rhea County Circuit Court jury convicted the appellant, William T. Minton, of two counts of second degree murder and one count of aggravated robbery. The trial court merged the murder convictions and sentenced the appellant to consecutive sentences of thirty-five years and eighteen years, respectively. On appeal, the appellant contends that (1) the evidence is insufficient to support the convictions; (2) the trial court erred by denying his motion to suppress evidence; (3) the trial court erred by allowing the medical examiner to offer testimony that lacked any scientific indicia of reliability and was outside her area of expertise; (4) the trial court erred by refusing to allow the defense to present evidence of a State witness's prior violent acts when the defense's theory was that the witness killed the victim; and (5) his sentence is excessive. Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Larry G. Roddy, Dayton, Tennessee, for the appellant, William T. Minton.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; J. Michael Taylor, District Attorney General; and James W. Pope, III, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The record reflects that the Rhea County Grand Jury indicted the appellant for first degree felony murder committed during the perpetration of robbery, first degree premeditated murder, and aggravated robbery. At trial, twenty-two-year-old Alan Smith testified that in July 2008, he lived in an apartment on Memorial Street in Dayton with his disabled grandmother, Mary Couch; his four-week-old daughter; and his fiancé, April Kinder. Alan's[1] aunt, Dorothy Smith, lived in a trailer about twenty-five feet from his apartment, and his aunt, Zola Smith, lived in an apartment near his apartment. He said the victim, Carlos "Cotton" McCuiston, was his uncle; was Dorothy and Zola's brother; and was a father figure to him. The victim was in poor health, had heart problems, received disability payments, and weighed about one hundred forty-five pounds. On the night of July 23 or in the early morning hours of July 24, 2008, Alan went to Zola's apartment to get a beer and a cigarette. He said that Zola was not there but that the victim and the appellant were sitting in the living room "drinking, having a great time." He said that he had known the appellant all his life and that the appellant "was part of our family." Alan stayed at Zola's apartment and talked with the victim for about twenty minutes. Then he returned to his apartment.

Alan testified that he later returned to Zola's apartment to get another beer and cigarette. He said that as he was reaching for the door, the door opened, and he "walked into" the appellant. Alan said that he asked the appellant, "Where's Cotton?" and that the appellant answered, "I killed the [son-of-a-bitch]." Alan said he did not believe the appellant because "I thought he was just some drunk talking, because they talk crazy like that all the time." Alan walked into the apartment and yelled for the victim. He looked for the victim but did not find him. He said that the appellant came back into the apartment and that he asked the appellant, "Where's Cotton at?" The appellant said, "You ought to look in the tub." Alan opened the bathroom door, turned on the light, and saw the victim lying face-down in the bathtub with his arms curled up underneath him. The victim's wallet was lying open against the tub, and blood was all over the walls and the tub. Alan reached over the tub and tried to turn the victim over. He said that he was scared because of all the blood and that he "went up against the wall." He rushed back to the victim and tried to help him. He did not know if the victim was alive and ran outside to get help. Alan said that the appellant was outside and that the appellant told him, "I killed the S.O.B." Alan hit the appellant in the mouth as hard as he could with his fist. The appellant fell over a chair and dropped a silver thermos he had been carrying. While the appellant was lying on the ground, Alan hit him again in the face. Then he ran to his apartment to find his grandmother and screamed, "Cotton's dead. Cotton's dead." He called 911 while Kinder ran to Zola's apartment.

Alan testified that the 911 operator told him to check the victim for a pulse. However, instead of returning to Zola's apartment to check the victim, Alan went to Dorothy's house

---

[1]Because some of the witnesses share the same last name, we will use their first names for clarity.

and told her the victim was dead. Alan and Dorothy ran to Zola's apartment. The appellant was unconscious and was still lying on the ground. Kinder was in the bathroom with the victim and was speaking on the telephone with 911. Alan said that the victim's head was bleeding, that clots of blood were in the victim's mouth, and that he tried to clear the victim's mouth so the victim could breathe. Alan was wearing denim jeans, a black tank top, and socks, and he wiped the victim's blood on his jeans. Alan's right hand was bleeding from his having hit the appellant. At some point, a police officer arrived and made everyone leave the apartment. Alan identified the victim's wristwatch, necklace, gold heart pendant, and diamond pinkie ring.

On cross-examination, Alan testified that he did not know what time he first went to Zola's apartment, but he acknowledged that he told the police he went to her apartment at 11:00 p.m. or 12:00 a.m. He said that he did not know if the appellant and the victim were intoxicated at that time but that the victim "had a good buzz." He acknowledged that he told the police he went back to his apartment and returned to Zola's apartment about fifteen minutes later, which meant he would have found the victim in the bathtub about 12:15 a.m. However, he said he did not know if his times were correct. He acknowledged that he lied to the police, telling them that he cut his hand on a faucet and that he heard the appellant fall over a chair. He said he lied to the police because he was afraid he would go to jail for hitting the appellant. Later, he admitted to the police that he hit the appellant. However, he told them that he hit the appellant only one time. He said he did not call 911 from Zola's apartment because he panicked. He said that he was wearing house shoes when he found the victim but that one shoe came off when he hit the appellant and that the other shoe came off when he ran to his grandmother's apartment. He said he thought the appellant was drunk when the appellant killed the victim because he smelled alcohol "all over" the appellant. He acknowledged that the appellant and the victim "got along" and said that "I don't even understand how it happened, what happened."

On redirect examination, Alan testified that he did not knock out the victim's tooth, did not stomp or strangle the victim, and did not kill the victim. He said he would have never hurt the victim.

April Kinder testified that in July 2008, she lived in an apartment on Memorial Street with her infant daughter; her fiancé, Alan Smith; and her fiance's grandmother, Mary Couch. The victim had had nine heart surgeries, including surgery to implant a pacemaker, and had numerous health problems. On the night of July 23, 2008, Couch gave her son, the victim, a small green Bic lighter. About 12:30 or 12:45 a.m. on July 24, Alan went to his aunt Zola's apartment to get a beer and a cigarette. He returned home about twenty minutes later with a beer and two cigarettes. Kinder did not see any blood or injuries on him at that time. About forty-five minutes later, Alan went back to Zola's apartment to get another beer. He returned

about five minutes later, screaming that the victim had been killed. Kinder said that Alan was "in a panic attack" and that he telephoned 911. She did not notice any blood on him. She went to Zola's apartment, found the victim lying in a fetal position in the bathtub, and telephoned 911. Blood was coming out of the victim's face; blood was on the tub, walls, and floor; and he did not have a pulse. Shortly thereafter, Alan and his Aunt Dorothy arrived. Alan put his finger into the victim's mouth and pulled out blood clots, trying to help the victim breathe. A police officer arrived and ordered everyone out of the apartment. Sometime after the officer arrived, Kinder saw William Harris come out of a bedroom, and he asked her why was she screaming and crying.

On cross-examination, Kinder testified that Alan never told her he hit the appellant. She said that when Alan and Dorothy arrived at Zola's apartment, Alan tried to pick up the victim. Kinder noticed for the first time that Alan had blood on his hands and pants.

Dorothy Smith testified that she lived in a trailer near Alan Smith's apartment. Her sister, Zola, lived in an apartment nearby. Her brother, the victim, lived with her part of the time and Zola part of the time. In the early morning hours of July 24, 2008, Dorothy was awakened by someone banging on her door. She went to the door and found Alan screaming "Cotton's dead, Cotton's dead." Dorothy ran to Zola's apartment and saw the victim lying in the bathtub. She said blood was "everywhere."

On cross-examination, Dorothy testified that the victim had been staying with Zola because he and Dorothy had gotten into an argument over the victim's dog. She denied that she was mad at the victim on July 23 or that she had his jewelry.

Seventy-two-year-old William Harris testified that in July 2008, he was sub-renting an apartment with Zola Smith. The victim also was living there. On the night of July 23, the appellant was in the apartment with Harris and the victim. The appellant and the victim were drinking beer, and Harris was drinking vodka. The appellant and the victim were watching television in the living room, and they had not been arguing. About 10:00 p.m., Harris went to bed and took his bottle of vodka with him. At some point, he heard strange voices and got up to investigate. He saw Alan Smith, Dorothy Smith, and April Kinder and walked to the bathroom. He said he looked in the bathroom and saw the victim "propped up on the tub where it was slanted." He also saw blood on the tub. An officer walked up behind Harris and told him to leave. When Harris got outside, he saw the appellant lying on the ground. He also found his bottle of vodka on the ground beside some mailboxes. He said that some of the vodka was missing but that "quite a bit" was still in the bottle.

Officer Jason Woody of the Dayton Police Department testified that he knew the victim, Alan, Dorothy, and Zola Smith. He did not know the appellant prior to this incident.

-4-

At 2:34 a.m. on July 24, 2008, he was dispatched to an apartment on Memorial Street. When he arrived, Dorothy ran toward his police car, screaming, "Cotton's dead, Cotton's dead." Officer Woody got out of his car, followed her, and found the appellant lying on his back outside the apartment. The appellant moved his head, and Officer Woody saw him breathing. Officer Woody said he went into the apartment, looked in the bathroom, and saw Alan "squatted down in a narrow area between the wall and the front of the bathtub." He said Alan told him, "I can't get a pulse. I can't get a pulse. They've killed Cotton." Officer Woody said he saw a bluish tint to the victim's face and "all the blood." He made everyone leave the apartment, radioed for medical help, secured the scene, and went outside to check on the appellant. The appellant was not wearing a shirt and had blood all over his torso, pants, and shoes. Glass from a broken thermos was on the appellant and the ground. His eyes were partially open, and Officer Woody told him to be still. Officer Woody said that the appellant had a "busted lip" and that "you could probably look anywhere about his body and find some type of blood spatter."

Officer Brian Malone of the Dayton Police Department testified that on July 24, 2008, he was dispatched to a home on Memorial Street and arrived a few seconds after Officer Woody. He saw the appellant lying on the ground, checked the appellant, and found a pulse. The appellant was wearing blue jeans and boots but no shirt. The appellant was not moving, and blood was all over his body. Officer Malone said that Dorothy Smith was distraught and that Alan Smith was very upset. Officer Malone went into the apartment, looked in the bathroom, and saw the victim lying on his left side in the bathtub. Blood was all over the victim's body and the tub. The victim did not have a pulse, and Officer Malone did not remember seeing a wallet.

Curtis Dean, a registered nurse at the Rhea Medical Center, testified that the appellant arrived at the emergency room in the early morning hours of July 24, 2008. The appellant had a cut on his lip and a laceration on his face, and the injuries were bleeding. Dean said he "bagged" the appellant's boots and blue jeans and gave them to the police.

Officer J.C. Byrd of the Dayton Police Department testified that he picked up the appellant's clothes from the Rhea Medical Center on July 24. In the left front pants pocket, he found a green Bic lighter, a gold necklace, a gold heart pendant, a gold diamond ring, and a gold watch. In the left rear pocket, he found a razor blade and a pack of rolling papers. After the appellant was released from the medical center, Officer Byrd took him into custody and transported him to jail.

Darinka Miluesnic-Polchan, the forensic pathologist who performed the forty-six-year-old victim's autopsy, testified that the victim had blunt force trauma injuries and strangulation injuries. Regarding the blunt force trauma injuries, the victim had a large

bruise on the top of his head and bruises and abrasions on the right side of his face, including his right ear. The victim also had extensive bruising on the left side of his face and lacerations and abrasions on his left ear. He had bruises on the back of his head, and one of the bruises had a pattern that looked like the sole of a shoe. Dr. Miluesnic-Polchan said she examined one of the appellant's boots introduced into evidence and that the pattern on the boot was "not inconsistent" with the pattern on the back of the victim's head. She said the victim had tremendous bruising and bleeding under the scalp and bleeding on the surface of the brain. Both of the victim's eyelids were bruised and swollen, his lips and tongue were bruised, and the inside of his lips was torn. The victim had been punched or kicked in the mouth and had lost a tooth. Although his head trauma was extensive, it was not necessarily fatal. Regarding the victim's strangulation injuries, the victim had bruises on both sides of his neck, hemorrhaging in his neck muscles, and neck fractures. She said the blood clots Alan Smith reportedly found in the victim's mouth could have been caused by damage to blood vessels in the victim's neck. The victim died of strangulation with blunt force trauma contributing to his death.

Dr. Miluesnic-Polchan testified that the victim was five feet, ten inches tall and weighed one hundred thirty-two pounds. The forty-six-year-old victim had an extremely large heart, coronary artery disease, scarring in the lungs, and abdominal scarring due to surgeries. She said the victim also had a pacemaker and was "kind of sick-looking." At the time of the victim's death, his blood alcohol concentration was .32 percent, four times the level required for driving under the influence. She said that alcohol usually was lethal at a blood alcohol concentration of .4 percent and that although alcoholics could tolerate lethal levels of alcohol, "it's going to influence some of their behavior."

On cross-examination, Dr. Miluesnic-Polchan acknowledged that she did not examine the appellant's boot until the morning of her testimony. She said that she used a regular ruler to measure the pattern on the sole of the boot but that she used calibrated rulers during autopsies.

The parties stipulated to the following: The appellant's blood alcohol concentration was .26 percent.[2] The appellant's blood tested positive for diazepam, a benzodiazepine known as Valium, and additional benzodiazepines also may have been present.

Investigator Darrell Bell of the Dayton Police Department identified a photograph of Alan Smith's black house shoes, which were found twelve to fifteen feet apart outside Zola Smith's apartment. Investigator Bell testified that blood was not on the shoes. He also identified photographs taken inside the apartment, showing a tooth on the floor in the living

_____

[2]The stipulation did not mention when the appellant's blood was collected for testing.

room, bloodstains on and beside a chair in the living room, and beer cans throughout the home. A bloody shoe print was on the side of the bathtub, which Investigator Bell thought was similar to the pattern on the appellant's boots. Investigator Bell looked at Alan's house shoes and concluded they were not similar to the bloody print in the bathroom. He identified photographs of the appellant's bloody hands and sutured lip.

On cross-examination, Investigator Bell acknowledged that photographs of the appellant showed he had a "busted lip" and a black eye. He said that he did not send Alan's clothes or house shoes to the Tennessee Bureau of Investigation (TBI) for blood testing and that Alan was not tested for the presence of drugs or alcohol. He said that scratches were on the appellant and that there was no evidence the victim had been dragged.

Lisa Wessner, a special agent forensic scientist with the TBI's serology and DNA analysis unit, testified that she tested evidence in this case for the presence of blood and DNA. The victim's blood was on the appellant's jeans and on the sides, tops, and bottoms of his boots. The victim's blood was on the tooth found in the living room.

Bobbie Quinonez, Alan Smith's birth mother, testified for the appellant that on July 23, 2008, she saw Dorothy Smith and the victim arguing in a parking lot about a dog and jewelry. The victim wanted Dorothy to return his dog and jewelry to him.

On cross-examination, Quinonez testified that someone adopted Alan Smith when he was three months old and that she did not raise him. She acknowledged that she did not know what jewelry the victim and Dorothy were arguing about. She said she had three prior convictions for forgery.

Thadeus Savage testified that he grew up with Alan Smith and that they were friends. About one week after the victim's death, Savage telephoned Alan. He said Alan told him that Alan and the victim had been drinking, that they got into a fight, and that "it went a little too far." Alan told Savage that he hit the victim on the head with something and that he strangled the victim.

On cross-examination, Savage said that he was living in Los Angeles at the time of the victim's death, that he heard about the murder, and that he telephoned Alan at Mary Couch's house. He said that during his conversation with Alan, Alan "didn't go really into details." Alan told Savage that he hit the victim with a lamp and that he strangled the victim with a lamp cord. Savage said he did not report the conversation to the police because he had "other things going on." He acknowledged having a 2009 conviction for burglary and a 2005 conviction for theft.

James Minton, the appellant's brother, testified that on July 22, 2008, the appellant spent the night at his house. The next morning, they woke about 8:00 a.m., worked on James's truck, and drank beer. The appellant drank about eighteen cans of beer and left with Gary Morgan about noon.

On cross-examination, James testified that the appellant worked at Bi-Lo at night, cleaning and waxing floors. The appellant usually drank more than two six-packs of beer per day. James said the appellant also drank vodka, and he acknowledged that the appellant "could hold his liquor."

Mary Minton, James Minton's wife, testified that on July 22, 2008, the appellant spent the night at their home. The next morning, the appellant and James worked on James's truck and drank beer. On cross-examination, Minton testified that the appellant was living with her and her husband at the time of the victim's death and that he left their home about noon or 12:30 p.m. on July 23. She acknowledged that although the appellant consumed a lot of alcohol, he could still function.

Gary Lynn Morgan testified that he had known the appellant for about two years and that they worked for the same company. One day shortly before the victim's death, Morgan picked up the appellant at James Minton's house and drove the appellant to work. However, on the night of July 23, Morgan arrived at work to find the appellant already there. He said that the appellant was unsteady on his feet, smelled of alcohol, and had slurred speech. He reported the appellant's condition to the store supervisor. The supervisor said the appellant could not remain in the store, so Morgan drove the appellant to the victim's house and returned to work. On cross-examination, Morgan testified that he drove the appellant to the victim's house about 11:00 or 11:30 p.m. and that the appellant had a thermos with him.

Alan Smith testified on rebuttal for the State that Thadeus Savage did not telephone him about one week after the victim's death and that he never told Savage he killed the victim. On cross-examination, Smith acknowledged that he and Savage were friends.

The jury convicted the appellant of two counts of second degree murder as a lesser-included offense of first degree felony murder committed during the perpetration of robbery and first degree premeditated murder. The jury also convicted the appellant of aggravated robbery. After a sentencing hearing, the trial court sentenced him to an effective sentence of fifty-three years in confinement.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support his convictions and that the trial court erred by refusing to grant his motion for judgment of acquittal. Specifically, he argues that no rational trier of fact could have found him guilty because the testimony of Alan Smith, the State's primary witness, was "incredible." He also contends that it would have been impossible for him to have killed the victim without tracking blood throughout the apartment. The State contends that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "The standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000).

Taken in the light most favorable to the State, the evidence shows that on the night of July 23 or in the early morning hours of July 24, 2008, Alan Smith went to Zola Smith's apartment to get a beer and a cigarette. The appellant and the victim were in the living room, drinking beer and watching television. William Harris was asleep in the bedroom. Alan spoke with the victim and went home. Sometime later, Alan returned to Zola's apartment and ran into the appellant. The appellant told Alan that he killed the victim. Alan did not believe the appellant, went into the apartment, and called for the victim. The appellant came into the apartment and told Alan to look in the bathtub. Alan went into the bathroom and found the bloody victim dead in the tub. Alan ran to get help and encountered the appellant again. The appellant told Alan for the second time that he killed the victim, and Alan hit the appellant twice in the face. Officer Malone testified that blood was all over the appellant's body, and Officer Woody testified that "you could probably look anywhere about his body and find some type of blood spatter." Dr. Miluesnic-Polchan testified that a shoe print on the

back of the victim's head was "not inconsistent" with the appellant's boot, and Investigator Bell testified that the pattern of a bloody shoe print on the side of the bathtub was similar to the appellant's boots. The victim's blood was on the appellant's jeans and on the tops, bottoms, and sides of the appellant's boots. Officer Byrd picked up the appellant's clothing at the hospital and found the victim's jewelry and lighter in the pocket of the appellant's jeans. The defense tried to blame the victim's death on Alan Smith. However, the appellant was the only person who had an opportunity to kill the victim, and the fact that the victim's property was found in the appellant's pants established a motive for the killing. Moreover, the appellant confessed to Alan Smith that he killed the victim. The jury, not this court, determines the credibility of the witnesses and the weight and value to be given their testimony. The jurors, as they were free to do, chose to accredit the evidence presented by the State. The evidence is sufficient to support the convictions.

## B. Motion to Suppress

The appellant contends that the trial court erred by denying his motion to suppress the evidence obtained from his pants and boots because the police lacked probable cause to seize them. The State argues that the trial court properly denied the motion to suppress. We agree with the State.

Before trial, the appellant filed a motion to suppress the evidence obtained from the seizure of his shirt and boots. At the suppression hearing, Officer Woody testified for the State that when he arrived at the scene on July 24, 2008, Dorothy Smith was "running around outside" and was screaming, "[T]hey've killed Cotton." Officer Woody said that he saw the appellant lying a few feet away from the apartment building and that "blood [was] pretty much covering his torso, pants, and stuff." Officer Woody saw the appellant breathing and went into the apartment. In the bathroom, he found Alan Smith kneeled beside the bathtub. He said Alan told him, "[T]hey've killed 'em. They've killed Cotton, I can't get a pulse." Officer Woody saw the victim, who was covered with blood, lying in a semi-fetal position in the tub and ordered everyone to leave the apartment. The victim was fully clothed, and no water was in the tub. Officer Woody waited for medical help to arrive and secured the scene.

On cross-examination, Officer Woody testified that when he first encountered the appellant lying on the ground, the appellant was unresponsive and had blood on his "torso, hands, head, everything." Officer Woody did not see any injuries on the appellant at that time and went inside to check on the victim. He said "a little bit" of blood was on Alan from Alan's having checked the victim for a pulse.

Officer Malone testified that he arrived at the scene shortly after Officer Woody and

saw the appellant lying on the ground. The appellant was wearing blue jeans and boots, and blood was on his jeans and body. Officer Malone went inside the apartment and saw the victim in the bathtub. He said he went outside and encountered Alan Smith, who told him that the appellant stated, "I killed the [mother fucker]."

On cross-examination, Officer Malone testified that Alan did not tell him that Alan hit the appellant. Officer Malone did not see any injuries on the appellant and did not remember seeing any blood on Alan. On redirect examination, Officer Malone acknowledged that he filed a report in this case and that he mentioned in the report the appellant's confession to Alan.

Officer Byrd testified that in the early morning hours of July 24, 2008, he was instructed to go to the Rhea County Emergency Room, sit with the appellant, and obtain the appellant's clothing. When Officer Byrd arrived, the appellant was in a room, and the appellant's clothing was in a bag. Officer Byrd said that the hospital staff had restrained the appellant because he kept trying to get up and that the appellant was "just cussing and yelling and going on." The appellant was released from the hospital about 6:45 a.m., and Officer Byrd arrested him and took him to jail. Officer Byrd turned over the bag of clothing to Investigator Bell.

On cross-examination, Officer Byrd testified that when he arrived at the hospital, the appellant was wearing a hospital gown and had a lot of dried blood on his face and around his nose. Officer Byrd did not see any injuries on the appellant and did not know where the blood came from. He acknowledged that the appellant was not free to leave the hospital.

Investigator Bell testified that when he arrived at the scene, the appellant already had been transported to the hospital. He acknowledged that Officers Woody and Malone told him about the appellant's condition and the blood on his person. He also acknowledged that Officer Malone told him about Alan's claim that the appellant said he killed the victim. Investigator Bell went into the apartment and saw the victim in the bathtub. There was a lot of blood in the tub but no water. He also saw what appeared to be a bloody boot print in the bathroom. Investigator Bell knew the appellant had been wearing boots. Based on his observations at the scene and statements made to him, he thought he had probable cause to arrest the appellant.

On cross-examination, Investigator Bell testified that Alan Smith told him at the scene that Alan hit the appellant. Blood was on Alan, and Investigator Bell identified a photograph showing blood on Alan's jeans. Investigator Bell went to the hospital and took photographs of the appellant. The appellant had been hit in the face, and a lot of blood was on his face and around his nose.

The appellant argued that the police lacked probable cause to arrest him, and, therefore, that his clothes and any evidence obtained from them should be suppressed. The trial court disagreed, holding that the appellant's confession to Alan Smith and the amount of blood on the appellant established probable cause for his arrest.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." Odom, 928 S.W.2d at 23.

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect citizens against unreasonable searches and seizures. Generally, a warrantless search is presumptively unreasonable and thus violates constitutional protections. See State v. Walker, 12 S.W.3d 460, 467 (Tenn. 2000). Evidence derived from such a search is subject to suppression unless the State "demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement." State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998). One such exception occurs "[w]hen a felony has in fact been committed, and the officer has reasonable cause for believing the person arrested has committed the felony." Tenn. Code Ann. § 40-7-103(a)(3). "Our courts make little, if any, distinction between the terms 'reasonable cause' and 'probable cause' in determining whether there exists a basis for an arrest." State v. Herbert Lee Massey, No. 01C01-9406-CR-00218, 1995 Tenn. Crim. App. LEXIS 736, at **9-10 (Nashville, Sept. 1, 1995). Probable cause "means more than bare suspicion" and "exists where the facts and circumstances within . . . the officer['s] knowledge, and of which [he] had reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." State v. Day, 263 S.W.3d 891, 902 (Tenn. 2008) (quotation marks and brackets omitted). "Whether probable cause is present depends upon whether the facts and circumstances and reliable information known to the police officer at the time of the arrest 'were sufficient to warrant a prudent man in believing that the [individual] had committed an offense.'" State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).

Turning to the instant case, the evidence at the suppression hearing shows that when the officers arrived at Zola Smith's apartment, they found the appellant lying unresponsive

on the ground and the bloody victim lying dead in the bathtub. A large amount of blood was on the appellant's face, torso, hands, and clothing. The appellant was wearing boots, and Investigator Bell saw what appeared to be a bloody boot print in the bathroom. Officer Malone testified that Alan Smith told him the appellant admitted killing the victim. As noted by the State, information from Alan, a known citizen informant, was presumed reliable. See State v. Cauley, 863 S.W.2d 411, 417 (Tenn. 1993); State v. Melson, 638 S.W.2d 342, 354 (Tenn. 1982). Based upon the evidence, the trial court properly concluded that the police had probable cause to arrest the appellant. As this court has stated, "the warrantless seizure of an individual's clothing may be considered as a reasonable, hence constitutional, search when made while he is in custody following his arrest." State v. Barger, 612 S.W.2d 485, 491 (Tenn. Crim. App. 1980) (quoting United States v. Edwards, 415 U.S. 800, 804-09 (1974)). Given that the appellant's clothing was seized pursuant to a lawful arrest, the trial court properly denied his motion to suppress.

## C. Dr. Miluesnic-Polchan's Testimony

Next, the appellant contends that the trial court erred by allowing Dr. Miluesnic-Polchan to testify that the pattern on the sole of the appellant's boot was "not inconsistent" with the pattern on the victim's head because Dr. Miluesnic-Polchan measured the boot pattern on the morning of her testimony with a simple ruler. He argues that her testimony, therefore, lacked "any scientific indicia of credibility" and misled the jury. The appellant also argues that the trial court erred by allowing Dr. Miluesnic-Polchan to testify that a high concentration of alcohol in a person who consumed alcohol daily would affect that person differently than a person who did not consume alcohol daily. The State contends that the appellant is not entitled to relief. We agree with the State.

It is well-settled that "the allowance of expert testimony, the qualifications of expert witnesses, and the relevancy and competency of expert testimony are matters which rest within the sound discretion of the trial court." State v. Rhoden, 739 S.W.2d 6, 13 (Tenn. Crim. App. 1987) (citing Murray v. State, 377 S.W.2d 918, 920 (1964); Bryant v. State, 539 S.W.2d 816, 819 (Tenn. Crim. App. 1976); State v. Holcomb, 643 S.W.2d 336, 341 (Tenn. Crim. App. 1982)). This court will not disturb the trial court's ruling absent a clear showing that the trial court abused its discretion in admitting or disallowing expert testimony. Id.; State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002). This court will not find an abuse of discretion unless it "'appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" Stevens, 78 S.W.3d at 832 (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

Regarding Dr. Miluesnic-Polchan's testimony about the pattern on the sole of the

appellant's boot, the State informed the trial court during a jury-out hearing just prior to her testimony that the pathologist had measured the pattern and was prepared to testify that it was "not inconsistent" with the pattern on the victim's head. Defense counsel said, "That's what I understand and that's fine. I don't see how we can object to that." Therefore, the issue has been waived. See Tenn. R. App. P. 36(a).

Regarding Dr. Miluesnic-Polchan's testimony about alcohol's affect on a person who consumed it daily, the pathologist testified that the victim's blood alcohol concentration at the time of this death was .32 percent. The State asked, "[F]or people who don't consume alcoholic beverages regularly, that would be an extremely high level, would it not?" The defense objected, stating, "I don't know the foundation is laid to answer that question." The State offered to reword the question and asked the witness, "[I]f a person consumed alcoholic beverages on a regular, I'll say daily basis, would even a high level concentration affect them differently than someone who only drank alcoholic beverages on rare occasions?" The defense renewed the objection, and the trial court ruled Dr. Miluesnic-Polchan could answer the question "within her training and a reasonable degree of medical certainty." Dr. Miluesnic-Polchan stated,

> Well, actually toxicology is a big part of forensic pathology. For instance, forensic pathology is one of maybe three specialties where I'm really qualified to talk about toxicology, and alcohol presence is part of toxicology, so yes, I can comment on that. That's within my qualifications. . . . [W]e are qualified, but to answer your question, absolutely, I mean, everybody knows that chronic consumption of alcohol is going to create some level of tolerance, and the chronic consumer is going to tolerate larger amounts, and behave differently than somebody who is naive to alcohol and never really consumed, or rarely consumes the alcohol.

Dr. Miluesnic-Polchan testified that as a forensic pathologist, she was qualified to talk about toxicology and answer the State's question. The trial court did not abuse its discretion by overruling the appellant's objection.

### D. Bobbie Quinonez's Testimony

The appellant contends that the trial court erred by refusing to allow him to question Bobbie Quinonez about Alan Smith's violent past. The appellant contends that Quinonez's testimony would have shown that Alan "had motive to unfairly blame the defendant for the death of the victim" and would have shown that Alan's "modus operandi was to employ

violence as a means of achieving resolution." The State argues that the trial court properly ruled Quinonez's testimony was inadmissible. We agree with the State.

Before Quinonez testified, the following exchange occurred during a jury-out hearing:

> [Defense counsel]: All right. The other thing she would testify to is that [Alan] Smith, it goes to his -- whether or not he has anger and aggression. It's really credibility, I guess, but she says that specific incidents she observed where he beat Mexicans with a ball bat and took their money. I want her to testify to that.
>
> [The State]: Are you saying you're trying to prove propensity to commit crimes?
>
> THE COURT: Correct.
>
> [Defense counsel]: Well, our defense is that he did it, and we want to show that he had a propensity to do it. These are odd questions, and I couldn't find authority.

The trial court ruled, "If your witness says that they're aware of his reputation in the community for violence then they possibly could testify to that."

The State requested that it be allowed to voir dire the witness in order to establish the basis for her testimony. Upon being questioned by defense counsel, Quinonez testified that Alan "[could] be mean" and violent "at times." On cross-examination, Quinonez testified that she had not had much contact with Alan. She said that in the last ten years, "Alan would come some weekends and stay with me, and they let me see Alan at times, but not a whole lot." She said that she had not talked with anyone in the community about Alan's reputation for violence and that she was basing her opinion on incidents she witnessed four or five years previously. She said that Alan "don't care too much for Spanish people" and that she saw him fighting with some "Spanish, Mexicans." She said she did not know the circumstances behind the fights, and she acknowledged that Alan could have been defending himself. She said she also witnessed incidents in which Alan became angry but did not become physically violent. The trial court ruled Quinonez could not testify about Alan's reputation for violence, stating,

> She's familiar with a few acts, apparently related to a Spanish person, or Spanish people, which the victim in this case is not,

-15-

and even as to those events, she wasn't an eyewitness more than once or twice, maybe that many times, so I think really it is stretching it to let her testify as to his reputation for violence and peacefulness in the community.

The appellant argues that pursuant to Tennessee Rules of Evidence 401 and 402, Quinonez should have been allowed to testify about Alan's prior acts of violence.

A criminal defendant has a right to present a defense. This right is guaranteed by the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment of the United States Constitution. State v. Brown, 29 S.W.3d 427, 432 (Tenn. 2000). "A proper defense includes the right to introduce evidence that someone other than the accused committed the crime." State v. Rice, 184 S.W.3d 646, 671 (Tenn. 2006) (citing State v. Powers, 101 S.W.3d 383, 394 (Tenn. 2003). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence that a third party had the motive and opportunity to commit the offense has been deemed relevant to a criminal prosecution." Rice, 184 S.W.3d at 672.

In our view, Quinonez's testimony was not relevant to establish that Alan had a motive and opportunity to commit the crimes. The only significant evidence pointing to Alan as the killer came from Thadeus Savage, who testified that Alan told him that Alan got into a fight with the victim and that "it went a little too far." However, the fact that Alan fought with some Hispanics four or five years before the victim's death is not relevant to establish a motive or opportunity to kill the victim in this case. Therefore, the trial court properly concluded that Quinonez's testimony was inadmissible.

E. Excessive Sentencing

Finally, the appellant contends that his sentences are excessive because the trial court misapplied enhancement factors. The State argues that the trial court properly sentenced the appellant. We agree with the State.

At the appellant's sentencing hearing, Janice Johnson, a probation officer, testified for the State that she prepared the appellant's presentence report. She said that in preparing the report, she confirmed with someone over the telephone that the appellant had three prior convictions in Florida for disorderly conduct, resisting arrest, and criminal mischief. She also confirmed with someone over the telephone that the appellant had five prior convictions in Davidson County, Tennessee. She said she thought all of the Davidson County convictions were misdemeanors.

On cross-examination, Johnson testified that she confirmed the appellant's Florida convictions with the "criminal clerk of courts for Hardee County" but that she did not know the person's name. Regarding the appellant's Davidson County convictions, she said she spoke with "a probation officer" and that the probation officer e-mailed a copy of the convictions for a "William Alvin Minton," born on May 28, 1959. The defense requested to see the e-mail and informed Johnson that the appellant's name was William Thomas Minton with a birth date of September 23, 1967. Johnson acknowledged that she had made a mistake and that the five Davidson County convictions did not belong to the appellant.

The appellant testified that he could not read or write very well but acknowledged that defense counsel went over the presentence report with him "line by line." He also acknowledged that except for the five Davidson County convictions, the presentence report was accurate.

On cross-examination, the appellant testified that he had never taken diazepam prior to July 23, 2008. He said that in addition to the diazepam, he also took a "pink pill" on the night of July 23. He said that he had taken nonprescribed Xanax previously and that he inaccurately told Janice Johnson that he had never taken drugs prior to the night of the victim's death. He acknowledged that he also told Johnson he did not have a problem with alcohol. He also acknowledged that Investigator Bell interviewed him on the afternoon of July 24, 2008, and that he told Investigator Bell he did not remember what happened after 10:00 p.m. on July 23, 2008. However, in the presentence report, he claimed he did not kill the victim. He maintained at the sentencing hearing that he did not kill the victim.

The State introduced the presentence report into evidence. According to the report, the then forty-two-year-old appellant had never been married and had no children. In the report, the appellant stated that he dropped out of school in the eighth grade because he could not read or write and could not keep up with his classes. He described his physical and mental health as "poor" and stated that he suffered from depression. According to the report, the appellant has had many "odd jobs." The appellant's most recent job was stripping and waxing floors for Bi-Lo. The report shows that the appellant has prior convictions of aggravated assault, assault, grand larceny, felonious escape, misdemeanor theft, joyriding, driving under the influence, reckless endangerment, possession of a weapon by a convicted felon, driving on a revoked license, public intoxication, reckless driving, evading arrest, and escape while on work release. He also has violated probation several times.

The trial court merged the conviction for count 1, second degree murder as a lesser-included offense of first degree felony murder, into the conviction for count 2, second degree murder as a lesser-included offense of first degree premeditated murder. The trial court determined that the appellant was a Range II offender and noted that the range of punishment

-17-

for second degree murder, a Class A felony, was twenty-five to forty years and for aggravated robbery, a Class B felony, was twelve to twenty years. See Tenn. Code Ann. § 40-35-112(b)(1), (2). The trial court found that the appellant's criminal history was "very, very extensive" and applied enhancement factor (1), that the appellant has "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range." Tenn. Code Ann. § 40-35-114(1). The trial court also applied factor (4), that the victim was particularly vulnerable because of physical disability, on the basis that "[t]his was a very weakened man . . . who would have had great difficulty in fighting with anybody," and factor (5), that the "defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense," on the basis that the appellant hit, stomped, and mistreated the victim. Tenn. Code Ann. § 40-35-114(4), (5). The trial court applied enhancement factors (8), that "before trial or sentencing, [the defendant] failed to comply with the conditions of a sentence involving release into the community," and (13), that at the time of the felony offense, the defendant was on probation, to both of his convictions. Tenn. Code Ann. § 40-35-114(8), (13)(C). Finally, the court applied factor (11), that the felony "resulted in death or serious bodily injury . . . and the defendant has previously been convicted of a felony that resulted in death or serious bodily injury," to his aggravated robbery conviction. Tenn. Code Ann. § 40-35-114(11). The trial court placed great weight on factor (1), finding it to be the only "major" factor.

The trial court sentenced the appellant to thirty-five years as a Range II, violent offender for the second degree murder conviction and eighteen years as a Range II, multiple offender for the aggravated robbery conviction. The court ordered that the sentences run consecutively due to the appellant's extensive criminal history and because he committed the offenses while he was on probation. See Tenn. Code Ann. § 40-35-115(b)(2), (6).

Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-103(5), -210(b); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of

correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

The appellant contends that his sentences are excessive because the trial court misapplied enhancement factors (4) and (5).[3] Initially, we note that the appellant's extensive criminal history alone was enough to justify his thirty-five- and eighteen-year sentences. See State v. Mitchell Eads, No. E2006-02793-CCA-R3-CD, 2008 Tenn. Crim. App. LEXIS 547, at *33 (Knoxville, July 21, 2008). In any event, regarding enhancement factor (4), that the victim was particularly vulnerable because of physical disability, this court has previously explained that

> a victim is particularly vulnerable within the meaning of this enhancement factor when the victim lacks the ability to resist the commission of the crime due to age, a physical condition, or a mental condition. A victim is also particularly vulnerable when his or her ability to summons assistance is impaired; or the victim does not have the capacity to testify against the perpetrator of the crime. However, a finding that one of these conditions exists does not, as a matter of law, mean that this factor is automatically considered. The appellant must have taken advantage of one or more of these conditions during the commission of the crime.

State v. Butler, 900 S.W.2d 305, 313 (Tenn. Crim. App. 1994) (footnotes omitted).

In this case, the evidence established that the victim was in extremely poor health, weighing just one hundred thirty-two pounds despite being forty-six years old and having a five-foot, ten-inch frame. He had had multiple heart and abdominal surgeries, had an enlarged heart with a pacemaker, and was receiving disability payments. Dr. Miluesnic-Polchan described him as "sick-looking." The appellant did not use a weapon to kill the victim; the appellant killed the victim by strangling, beating, and stomping him. See State v. Larry D. Anderson, No. W2001-02371-CCA-R3-CD, 2003 Tenn. Crim. App. LEXIS 339, at *30 (Jackson, Apr. 11, 2003) (holding that defendant's beating the victim with his bare hands as opposed to killing the victim with a weapon was relevant in determining the

---

[3]The appellant also contends that the trial court misapplied enhancement factor (6), that the "personal injuries inflicted upon, or the amount of damage to property sustained by or taken from, the victim was particularly great." Tenn. Code Ann. § 40-35-114(6). However, the trial court did not apply that factor to the appellant's sentences.

victim's physical vulnerability).  We conclude that the trial court properly applied enhancement factor (4).

As to enhancement factor (5), that the appellant treated the victim with exceptional cruelty, we conclude that the trial court also properly applied this factor.  In State v. Arnett, 49 S.W.3d 250, 258 (Tenn. 2001), our supreme court concluded that the exceptional cruelty factor is applicable in cases of "extensive physical abuse or torture."  In the present case, the evidence shows that the appellant beat the victim extensively all over his head, causing extensive bleeding on the victim's face, under the scalp, and on the surface of the brain.  The fact that the appellant's boot print was found on the victim's head established that the appellant stepped on or stomped him.  He also kicked or hit the victim in the mouth, knocking out a tooth and cutting the inside of the victim's lips.  The victim's savage beating went over and above what was required for second degree murder.  Id. at 258.  Therefore, the trial court properly applied enhanced factor (5).

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE